UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IGNACIO RUIZ,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>M. ELIOT SPEARMAN,<br><br>　　　　　　Defendant. | Case No.  18-cv-07681-EMC<br><br>**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Docket No. 1 |

Petitioner Ignacio Ruiz ("Mr. Ruiz" or "Petitioner") filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his conviction from Contra Costa County Superior Court.  Respondent (also referred to herein as "the government") has filed an answer to the petition, and Petitioner has filed a traverse.  For the reasons discussed below, the petition is **GRANTED**.

## I.　　BACKGROUND

A.　Factual Background

Petitioner was charged with conspiracy to commit murder (Cal. Penal Code §§ 182 (a)(1), 187), two counts of first-degree murder (Cal. Penal Code § 187) with multiple special circumstance allegations (Cal. Penal Code §§ 190.2(a)(3), (a)(22)), and active participation in a criminal street gang (Cal. Penal Code § 186.22(a)).  The charges included firearm enhancement allegations (Cal. Penal Code § 12022.53) and alleged that the conspiracy and murder counts were committed for the benefit of a criminal street gang (Cal. Penal Code § 186.22).  Docket No. 7-1 ("Ans."), Exh. 7 at 2 (California Court of Appeal decision on Petitioner's direct appeal from his conviction).  Following trial, Petitioner was convicted of all charges and sentenced to 50 years

plus two consecutive life terms without the possibility of parole.

The California Court of Appeal recounted the facts surrounding Petitioner's conviction, as adduced at trial, as follows.  The Sureños and the Norteños are gangs with "a longstanding rivalry and hatred for one another that manifest through acts of violence."  *Id.* at 2.  The Sureños have "adopted the color blue . . . as their symbol[]" whereas "the Norteños have adopted the color red . . . as their symbol[]."  *Id.*  On the evening of August 30, 2009, two members of the Norteños, Corrina Whitney and Intiaz Ahmed, were shot and killed in a bar in Richmond by two men wearing blue bandanas over their faces.  *Id.* at 3.  "The first man was wearing a white T-shirt and holding a shotgun with a pistol grip and the second man had a handgun."  *Id.*

"Based on the report that the shooters had been wearing blue bandanas and the victims had been wearing red, officers were dispatched to appellant Ruiz's home . . . , which was known from prior police contacts as a place where Sureño gang members regularly congregated."  *Id.* at 4.  On Ruiz's property, the officers found, among other things, a white T-shirt, a blue bandana, a "Mossberg shotgun with a pistol grip," and "a .22-caliber single action revolver."  *Id.* at 4–5.  They arrested Victor Torres and Steven Miranda on the property.  *Id.*  The officers also encountered Eliseo Flores, whose DNA was later found on the grip of the Mossberg shotgun.  *Id.* at 5.

Ruiz was interviewed twice by the police.  *Id.* at 6.  During the first interview, "police handed Ruiz a note they (falsely) said was written by Flores, which stated that Flores had told the truth.  After reading the note, Ruiz acknowledged picking up Miranda, Torres and Flores at their houses and driving around in his car.  He said he stopped to see a friend who lived on 37th Street (near the [bar where the shooting took place]), while Miranda, Torres and Flores went to the store and came back.  They drove to Ruiz's house, and Flores gave Ruiz guns to hide, which he had not seen before.  During the second interview, Ruiz told police he got the shotgun from Flores and the revolver from Miranda when they returned to his car.  He said Flores told him he had walked in, seen some Norteños, and shot them, and Miranda said he had also fired some shots.  Ruiz did not know what Torres was doing while Miranda and Flores were gone; he might have been sitting in the backseat of the car."  *Id.* at 7.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   "At trial, Ruiz testified that about half an hour after he returned home from visiting his

2   parents in Vallejo, he went out again and picked up Flores, Torres and finally Miranda.  Although

3   he picked up Torres 'at a liquor store,' they decided to go somewhere to buy some alcohol and go

4   to a party Miranda was planning to attend.  Flores asked Ruiz to pull over on McBryde Avenue

5   near the [bar] and got out with Miranda and Torres.  Ruiz then drove to the home of a friend, Juan

6   Zepeda, who lived about a block away.  But before he could knock on Zepeda's door, Ruiz saw

7   the others walking toward him, and they all got back into the car.  Flores said he had shot some

8   Norteños and Ruiz drove them back to his house at Flores's direction.  When they arrived, Ruiz

9   saw for the first time that Flores had a shotgun at his side.  He took the shotgun from Flores and

10  either Miranda or Torres handed him a gun from the back seat; Ruiz went straight to his bedroom

11  and threw the shotgun under his bed and the handgun into a drawer. . . .  Ruiz admitted he had

12  made false statements to police during his interviews, but claimed he did so to protect Miranda,

13  Flores and Torres.  He denied knowing in advance that any of them had weapons or intended to

14  commit a shooting.  Although he understood the Sureños were violent, he was not involved in

15  their criminal activities and was only a social member of the gang."  *Id.* at 7–8.

16  "During closing argument, counsel for Ruiz argued Ruiz was not guilty of the charged

17  offenses because he did not know about the shooting in advance and was simply trying to protect

18  his fellow gang members."  *Id.* at 9.

19  B.    Procedural Background

20  Kellin Cooper ("Mr. Cooper") represented Petitioner from arraignment through

21  preliminary hearing, until November 2010.  Subsequently, Daniel Cook ("Mr. Cook") was

22  retained as counsel from November 2010 through the jury trial and sentencing.  On February 18,

23  2012, the Contra Costa County District Attorney offered to drop all other charges and

24  enhancements if Petitioner pleaded guilty to two counts of second-degree murder, carrying two

25  concurrent indeterminate sentences of 15 years to life.  Ans., Exh. 11 at 1.  Petitioner declined the

26  offer "shortly thereafter."  Ans., Exh. 1 to Exh. 12 at 1.  However, the district attorney left the

27  offer open until the beginning of trial.  *Id.*

28  On November 27, 2012, the District Attorney filed an information charging Petitioner with

3

conspiracy to commit murder, two counts of first-degree murder, and alleged active participation in a criminal street gang.  *Id*. at 2.  It included a firearm enhancement as to all counts, and further alleged the conspiracy and murder counts were committed for the benefit of a criminal street gang. *Id*.  On February 5, 2013, after deliberating for three days (Ans., Exh 2 at 2), the jury found Petitioner guilty on all counts, found the murders to be in the first degree, the enhancements true, and the special circumstances true.  Ans., Exh. 1 at 2.  The trial court sentenced Petitioner to 50 years to life and two consecutive terms of life without parole.  *Id*. at 5.  On March 22, 2016, the California Court of Appeal affirmed the judgment on direct appeal.  *Id*. at 38.  On June 29, 2016, the California Supreme Court denied Mr. Ruiz's petition for review.  Ans., Exh. 9.

On September 20, 2017, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which was summarily denied on December 19, 2018.  Ans., Exh. 14. No habeas petition was filed in the Superior Court.  On December 21, 2018, Petitioner filed the instant habeas petition in this Court.  Docket No. 1.  Respondent filed an answer on March 15, 2019.  Ans.  Petitioner filed his traverse on June 3, 2019.  Docket No. 12 ("Traverse").

## II.     JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  Venue is proper because the petition concerns the conviction and sentence of a person convicted in Contra Costa County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## III.     STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts may entertain a petition for writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits[1] in state court unless

---

[1] The California Supreme Court need not state explicitly that it is adjudicating a claim "on the merits" if it denies a claim summarily, nor does it need to give its reasoning for a decision. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  "When a federal claim has been presented to a

United States District Court
Northern District of California

the state court's adjudication of the claim: "(1) Resulted in a decision that was contrary to or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d).  This is a "highly deferential standard." *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004).

Under § 2254(d)(1), the state court "unreasonably applied the law if it identified the right legal principle but applied it in an objectively unreasonable way." *Nunes v. Mueller*, 350 F.3d 1045, 1051 (9th Cir. 2003) (internal quotations omitted).  "A federal habeas court may grant the writ if the state court arrived at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 413 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Under § 2254(d)(2), the reviewing court must determine whether the state court's conclusion was based on "an unreasonable determination of facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2).  Like the § 2254(d)(1) standard, the 2254(d)(2) "standard for finding that a state court made an unreasonable determination of the facts is 'daunting,' and 'will be satisfied in relatively few cases.'" *Jones v. Harrington*, 829 F.3d 1128, 1136 (9th Cir. 2016) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)). However, where the state court "plainly misapprehend[s] or misstate[s] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to the petitioner's claim," the decision may be "an unreasonable determination of the facts." *Taylor*, 366 F.3d at 1001.

_____

state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.*

United States District Court
Northern District of California

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court.  *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).  "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  *Id.* at 803.  When confronted with an unexplained decision from the last state court to have been presented with the issue, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale.  It should then presume that the unexplained decision adopted the same reasoning."  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  If, however, there is no reasoned state court decision addressing the same claim, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision[.]"  *Richter*, 562 U.S. at 99.

Here, the only decision on Petitioner's state habeas claims was the California Supreme Court's summary denial.  The preceding state court proceedings on Petitioner's direct appeal from his conviction did not address any issues relevant to the habeas claims he raises now.  *See* Ans., Exh. 7 at 10.  In the absence of a state court decision that provides a "relevant rationale," *Wilson*, 138 S. Ct. at 1192, this Court "must determine what arguments or theories supported or . . . could have supported" the California Supreme Court's summary denial of Petitioner's habeas claims, *Richter*, 562 U.S. at 99.

## IV.   DISCUSSION

Petitioner's habeas petition before this Court contends his pre-conviction counsel provided ineffective assistance of counsel in connection with Mr. Ruiz's decision to reject the prosecutor's plea offer and go to trial.  Two aspects of counsel's advice are at issue.

First, Petitioner contends that his pre-conviction counsel erroneously told him that if he accepted the plea to second-degree murder with an indeterminate sentence, there was no real possibility he could be granted paroled – that he would effectively serve a life sentence.  Traverse at 11.  Petitioner alleges that both his attorneys (Mr. Cooper and Mr. Cook) advised him to not take the indeterminate plea offer "because no lifers ever get paroled anyway, so . . . taking such an offer would be the effectively same as LWOP."  Declaration of Ignacio Ruiz ("Ruiz Decl.") ¶ 3,

United States District Court
Northern District of California

1    Docket No. 7-5.  Petitioner further alleges: "I was told I should only take an offer if it involved a

2    determinate term so I had some chance of release."  *Id.*

3         With his petition, Petitioner submitted an expert declaration from Susan L. Jordan, who

4    "specialize[s] in parole release for California life-term inmates serving life sentences" and opined

5    in her declaration that the parole advice Mr. Cooper and Mr. Cook provided to Petitioner was

6    deficient.  Ans., Exh. 11G ("Jordan Decl.") ¶ 3.  Ms. Jordan explained that the California Supreme

7    Court decisions in *In re Lawrence*, 44 Cal. 4th 1181 (2008) and *In re Shaputis*, 44 Cal. 4th 1241

8    (2008) changed the standard for granting parole and made parole grants more likely than they had

9    been before 2008.  *Id.* ¶ 39.  Prior to those decisions, the Board of Parole Hearings needed only

10   "some evidence" of a prisoner's unsuitability factor to deny parole.  *Id.* ¶ 42 (quoting *In re*

11   *Rosenkrantz*, 29 Cal. 4th 616, 658 (2002)).  *Lawrence* clarified, however, "that 'the paramount

12   consideration' in making parole determinations was whether the inmate posed a current

13   unreasonable risk of danger to public safety," and "rejected the denial of parole based solely on

14   the circumstances of the life crime or other unsuitability factors a prisoner could never change."

15   *Id.* ¶ 43 (quoting *Lawrence*, 44 Cal. 4th at 1210–12).  As a result of this change in law, and of

16   Governor Edmund G. Brown taking office in 2011, "a record number of lifer inmates [were]

17   released from California prisons" in the years after these changes occurred.  Ans., Exh. 11H at

18   270; *see also* Jordan Decl. ¶ 38 ("between 2008 and 2012, prisoners serving life sentences with the

19   possibility of parole were being granted parole and released from prison at the highest rate since

20   the 1970s").

21        Ms. Jordan notes that "[p]rior to 2008 [when *Shaputis* and *Lawrence* were decided], less

22   than 8% of life-term inmates who appeared before the Board for a parole suitability hearing

23   received a grant of parole by the Board," but that even that low rate indicates that *some people*

24   serving life terms were being paroled.  Jordan Decl. ¶ 46.  In addition, Ms. Jordan asserts that by

25   2012, when Petitioner's plea offer was made, "the Board's grant rate had more than tripled to just

26   shy of 30%."  *Id.* ¶ 48.  That increase also coincided with declining rates of reversal by various

27   California Governors (that is reversal of Board decisions granting parole), which meant that more

28

United States District Court
Northern District of California

people serving life-terms were being paroled than had been in recent history.  *Id.* ¶ 50.[2]  Relying on this data, Ms. Jordan concludes that "Mr. Cooper's and Mr. Cook's belief that *no one* with a life sentence was or would ever be paroled was entirely incorrect."  *Id.* (emphasis added); *see also* Jordan Decl. ¶ 37 ("any statements Mr. Cooper and/or Mr. Cook made to Petitioner concerning these fallacious opinions [that defendants serving life sentences or convicted with gang allegations never get parole] – which amounted to nothing more than utter speculation and guesswork – and any degree to which their opinions influenced the outcome of Petitioner's case was grossly irresponsible lawyering").

In light of the information provided by Ms. Jordan, Petitioner asserts that, had he been aware that—contrary to counsels' beliefs and advice—he *would* have had a chance of obtaining parole had he accepted the plea offer, he would have accepted it.

Second, Petitioner contends that his trial counsel incorrectly advised him that if he went to trial, the jury would be given an instruction on the lesser-related offense of accessory after the fact, which would have afforded the jury an intermediate option between outright acquittal and conviction on first-degree murder.  *Id.* at 9.  Because Petitioner contends this advice turned out to be inaccurate in both respects (as it pertained to his parole chances and the availability of the lesser-included instruction), Petitioner argues that he was deprived of an opportunity to make an intelligent decision when he rejected the prosecutor's plea offer, particularly given the greater risk of a murder conviction where the jury is not afforded a middle option.

A.    Ineffective Assistance of Counsel Standards

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984) established the standard for demonstrating constitutionally ineffective assistance of counsel. Under *Strickland*, the petitioner must show that (1) "the counsel's performance was deficient," *i.e.*,

---

[2] While this information suggests that parole grant rates for people serving life sentences were increasing, it should also be noted that a 30% grant rate does not mean that 30% of people serving life sentences were paroled in 2012; rather, it indicates that 30% of inmates sentenced to life *with hearings* were being paroled each year, but not all lifers have hearings.  For example, Figure 2 in the relevant report shows a 100% grant rate in 1978, but that was because only one lifer was found suitable for a hearing (and was subsequently granted parole) that year, not because all lifers were granted parole in 1978.

1   that it "fell below an objective standard of reasonableness under prevailing professional norms";

2   and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the

3   results of the proceeding would have been different." *Id*. at 687–88.

4       The "deficient performance" prong requires a defendant to demonstrate that "counsel made

5   errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth

6   Amendment." *Id.*  In evaluating counsel's performance, there is "a strong presumption that the

7   counsel's conduct falls within the wide range of reasonable professional assistance; that is, the

8   defendant must overcome the presumption that, under the circumstances, the challenged action

9   might be considered sound trial strategy." *Id*. at 689 (internal quotation marks omitted).

10      Under the "prejudice" prong, the defendant must demonstrate "a reasonable probability

11   that, but for counsel's unprofessional errors, the result of the proceeding would have been

12   different.  A reasonable probability is a probability sufficient to undermine confidence in the

13   outcome." *Id.* at 694.  Where the ineffective advice led to a rejection of a plea agreement, to

14   establish prejudice "a defendant must show that but for the ineffective advice of counsel there is a

15   reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the

16   defendant would have accepted the plea and the prosecution would not have withdrawn it in light

17   of intervening circumstances), that the court would have accepted its terms, and that the conviction

18   or sentence, or both, under the offer's terms would have been less severe than under the judgment

19   and sentence that in fact were imposed." *Lafler v. Cooper*, 566 U.S. 156, 163–64 (2012).

20      "The standards created by *Strickland* and Section 2254(d) are both highly deferential, and

21   when the two apply in tandem, review is doubly so." *Sanders v. Cullen*, 873 F.3d 778, 814 (9th

22   Cir. 2017) (citing *Richter*, 562 U.S. at 105).  "The pivotal question is whether the state court's

23   application of the *Strickland* standard was unreasonable.  This is different from asking whether

24   defense counsel's performance fell below *Strickland*'s standard. . . . A state court must be granted

25   a deference and latitude that are not in operation when the case involves review under the

26   *Strickland* standard itself." *Richter*, 562 U.S. at 101.

27   B.   Mr. Cooper's Advice

28      Mr. Cooper represented Mr. Ruiz until November 2010, prior to trial and prior to the

receipt of Mr. Ruiz's plea offer.  In his declaration, Mr. Cooper states: "I do not have an independent recollection of whether an indeterminate plea offer was made to Mr. Ruiz during my representation of him.  However, I do know that during the course of my representation of Mr. Ruiz we discussed his charges and potential punishments.  I would have advised Mr. Ruiz against accepting any indeterminate term offer because I did not believe there was any realistic hope that a defendant with gang allegations would ever be paroled regardless of the length of the indeterminate term."  Declaration of Kellin R. Cooper ("Cooper Decl.") ¶ 6, Docket No. 7-5; *see also* Declaration of Tara K. Hoveland (Mr. Ruiz's habeas attorney) ("Hoveland Decl.") ¶ 9, Docket No. 7-5 (stating that she spoke with Mr. Cooper, who said that, in his opinion, "no gang member would ever get out on parole," and that it was "very possible" he said as much to Mr. Ruiz).  In Mr. Ruiz's declaration, he does not say that Mr. Cooper advised him about a specific plea offer at any point or even that *Mr. Cooper* himself advised him on the issue of pleas; Mr. Ruiz merely says "I was advised not to take any indeterminate plea offers because no lifers ever get paroled anyway. . . . I was told I should only take an offer if it involved a determinate term so I had some chance of release."  Ruiz Decl. ¶ 3.

As noted above, to prevail on his IAC claim regarding Mr. Cooper, Mr. Ruiz must first demonstrate "deficient performance" under the "doubly deferential" standard articulated in *Yarborough*.  As a threshold matter, however, the evidence presented by Petitioner does not demonstrate that Mr. Cooper actually advised Mr. Ruiz about the specific plea offer he received in February 2012 or—as noted above—about *any other* plea offer that Mr. Ruiz might have received. *See* Cooper Decl.; *see also* Ans. at 12 ("Cooper said he did not think petitioner would have had a chance of being paroled.  But he does not indicate whether he actually communicated that belief to petitioner." (internal citations omitted)).  Given Mr. Cooper's statement that he and Mr. Ruiz discussed "potential punishments," the evidence established that Mr. Cooper likely advised Mr. Ruiz on the topics of plea offers and/or parole chances generally, but it does not establish that he advised Mr. Ruiz regarding a specific plea offer.  To the extent that Mr. Ruiz contends that Mr. Cooper advised him about a specific plea offer, there is simply no evidence in the record to suggest that such advice was given.  Indeed, the plea offer from the DA was not made until

February 18, 2012, more than a year after Mr. Cooper was replaced by Mr. Cook.

In addition, even if Mr. Cooper's statement about parole informed Mr. Ruiz about the general consequences of a life sentence, it is also critical to note that Mr. Cooper's stated beliefs about Mr. Ruiz's chances for parole related to "defendant[s] with gang allegations"; his view was that "no gang member would ever get out on parole."  Hoveland Decl. ¶ 9.  However, the plea offer extended to Mr. Ruiz offered to drop all charges and enhancements (including those which were gang-related) if Mr. Ruiz pleaded guilty to two counts of second-degree murder.  Ans., Exh. 11 at 1.  Thus, any advice on plea offers and parole chances that Mr. Cooper may have given to Mr. Ruiz would have required "reevaluat[ion] in light of the offer that was actually made."  Ans. at 12.

Because Mr. Ruiz has not demonstrated that Mr. Cooper advised him about the plea offer he received in February 2012 (or about any other plea offer), he has not demonstrated that Mr. Cooper's performance as counsel was deficient and perforce, he has not met the heightened threshold for federal habeas relief.

Accordingly, the Court cannot say that—with respect to Mr. Cooper's advice regarding Mr. Ruiz's likelihood of parole—the state court's decision to deny Mr. Ruiz habeas relief "was based on an unreasonable determination of the facts" or that it "[r]esulted in a decision that was contrary to or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d).  It cannot be said that the state court committed a legal error so clear that "fairminded jurists" could not disagree about the result.  *See Richter*, 562 U.S. at 101.  Nor can this Court say that the state court "plainly misapprehend[ed] or misstate[d] the record in making [its] findings." *Taylor*, 366 F.3d at 1001.  Nonetheless, given the undisputed evidence that Mr. Cooper advised Mr. Ruiz there was  no "realistic hope" that a defendant with gang allegations would ever be paroled (regardless of the length of the indeterminate term), that fact is relevant to Mr. Ruiz's receptiveness to similar advice he subsequently received from Mr. Cook, as discussed below.

C.    Mr. Cook's Advice

      1.    Misadvice Regarding Likelihood of Parole if Petitioner Pled

Mr. Cook represented Mr. Ruiz after Mr. Cooper's representation concluded in November

2010; Mr. Cook was Mr. Ruiz's lawyer when the relevant plea offer was received and at trial. In his declaration, Mr. Cook states that he pursued a plea agreement that would result in a determinate term, but that the District Attorney would not make such an offer.  *See* Declaration of Daniel E. Cook ("Cook Decl.") ¶ 4, Docket No. 7-5; *see also* Hoveland Decl. ¶ 10 (stating that Mr. Cook reported that Mr. Ruiz "was just trying to get a determinate term").  He also contends that he received the plea offer at issue here on February 18, 2012 and that he conveyed the plea offer to Mr. Ruiz, who rejected it.  Cook Decl. ¶ 5.  He does not discuss whether or how he advised Mr. Ruiz with respect to the plea offer.  *See* Cook Decl.; *see also* Hoveland Decl. ¶ 11 ("Mr. Cook would not discuss with me what advice he gave petitioner . . . .").  Ms. Hoveland, Mr. Ruiz's habeas attorney, also stated that Mr. Cook told her "that back when the case was going to trial he didn't think there were that many people getting paroled and none of his former clients had been paroled at that time."  Hoveland Decl. ¶ 10.  In Mr. Ruiz's declaration, he states: "I was offered a plea to second degree murder with a sentence of 15-Life.  I wanted to take it, but when I asked Mr. Cook what he thought, he said that he had never heard of a lifer paroling and that we should go to trial because he believed I had a 50/50 chance if I went up and testified."  Ruiz Decl. ¶ 4. Mr. Ruiz adds that "[h]ad Mr. Cook explained to me that if I had accepted the 15-to-Life offer, that there was a possibility I would be granted parole some day, I would have accepted that offer and not proceeded to trial."  *Id.* ¶ 5.

Here, too, the analysis as to whether Mr. Cook provided inadequate assistance of counsel begins with an inquiry into whether his advice to Mr. Ruiz constituted deficient performance.

Mr. Ruiz affirmatively states in his declaration that Mr. Cook told him that "he had never heard of a lifer paroling."  Ruiz Decl. ¶ 4.  Mr. Ruiz also states: "Had Mr. Cook explained to me that if I had accepted the 15-to-Life offer, that there was a possibility I would be granted parole some day, I would have accepted that offer and not proceeded to trial."  Ruiz Decl. ¶ 5.  Although Mr. Cook did not say that he *did* provide such advice to Mr. Ruiz, he did not *deny* giving Mr. Ruiz such advice.  And he specifically declined to discuss with Ms. Hoveland what advice he gave on the subject.  Hoveland Decl. ¶ 11.  However, as noted above, in her declaration, Ms. Hoveland stated that Mr. Cook told her "that back when the case was going to trial he didn't think there were

that many people getting paroled and none of his former clients had been paroled at that time." *Id.*
¶ 10.  Given Mr. Cook had an ethical duty to convey the DA's plea offer, absent contrary
evidence, it must be assumed he did convey the plea to Mr. Ruiz.  Thus, Mr. Cook discussed with
Mr. Ruiz its terms, including the favorability *vel non* of the term of 15-years-to-life.  Given Mr.
Cook's statement as described above, the state court could not have reasonably determined that
Mr. Cook did not advise Mr. Ruiz that if he took the plea of 15-years-to-life he would have no
chance of parole.

Having found that it would have been unreasonable for the state court not to conclude that
Mr. Ruiz was so informed, the first question is whether the erroneous advice constituted deficient
performance under *Strickland*.  In this regard, it is necessary to examine Mr. Ruiz's *actual chance*
of being paroled.  For plea counseling to be deficient under *Strickland*, a petitioner must establish
that the advice was "so incorrect and so insufficient that it undermined the defendant's ability to
make an intelligent decision about whether to accept the plea offer." *Turner v. Calderon*, 281 F.3d
851, 880 (9th Cir. 2002) (internal quotations omitted).  For bad advice to rise to that level, it must
be more than "a mere inaccurate prediction" which, "standing alone, would not constitute
ineffective assistance." *Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir. 1986).  Instead, the advice must
constitute a "gross mischaracterization of the likely outcome" of a plea bargain "combined with
. . . erroneous advice on the possible effects of going to trial." *Id.*

///
///
///
///
///
///
///
///
///
///

1    While Mr. Ruiz and the supporting declaration he provides from Ms. Jones indicate that

2 individuals serving life-terms were being paroled at increasingly high rates at the time that Mr.

3 Ruiz received his plea offer, the materials that Mr. Ruiz has presented to the Court do not squarely

4 address the probability of someone in his circumstances (*i.e.* someone convicted of two counts of

5 second-degree murder) being paroled at that time.  As a starting point for that analysis, Mr. Ruiz

6 (through the declaration of Ms. Jordan) argues that by 2012, when Petitioner's plea offer was

7 made, "the Board's [overall] grant rate had more than tripled to just shy of 30%."  Jordan Decl. ¶

8 48.  He further asserts that—when combined with the fact that Governor Brown was reversing

9 parole grants at a far lower rate than previous governors—the board's overall grant rate shows

10 that, at the time of Mr. Ruiz's plea offer, prisoners serving life sentences with the possibility of

11 parole were being released from prison at historically high rates.  *Id.* ¶ 38.



Attachment A to Jones Decl. ("*Predicting Parole Grants*") at PDF p. 4, Docket No. 7-5 (showing

the grant rate at hearings for lifers).  Lifers include those given life sentences for both murder and

non-murder crime; people convicted of murder make up over 80% of lifers.  *See* Attachment B to

Jones Decl. ("*Life in Limbo*") at 15, Docket No. 7-5.

United States District Court
Northern District of California



*Id.* at PDF p. 3 (showing the Governor's reversal rate for parole grants involving murder cases).



*Life in Limbo* at 15.  Although no data for people convicted of murder was provided after 2010, it

can fairly be inferred from Figure 2 that their parole rates went up along with the rates for other

lifers after 2010, particularly given the fact that people convicted of murder comprised over 80%

1   of lifers.  *Id.*

2         In response, the Government asserts that "all of petitioner's statistics and argument

3   concerns the likelihood for parole for the *average* lifer . . . . Nothing in petitioner's statistics or

4   argument shows that someone convicted of multiple murders is likely to be granted parole."  Ans.

5   at 18.  Mr. Ruiz was convicted of two murders.  Indeed, the documents upon which Ms. Jones

6   relies reveal that "[t]he likelihood of a lifer convicted of murder being granted parole by the Board

7   and not having the decision reversed by the Governor is—and always has been—slim.  In 2010,

8   the probability was approximately six percent."  *See* Attachment B to Jones Decl. ("Life in

9   Limbo") at 4, Docket No. 7-5.  To that end, although the six percent figure would certainly have

10  been higher in 2012 than in 2010—because the board's overall grant rate was higher in 2012 than

11  in 2010, and the governor's reversal rate (for parole decisions involving murder rates) was

12  lower—the documents provided by Mr. Ruiz do not indicate precisely *how much* higher, nor do

13  they *directly* address the impact these changes might have had on someone in Mr. Ruiz's specific

14  circumstances.

15        However, the government's statement that "[n]othing in petitioner's statistics or argument

16  shows that someone convicted of multiple murders is likely to be granted parole," Ans. at 18, is

17  not exactly accurate.  For one thing, the authors of *Life in Limbo* concluded—on a preliminary

18  basis (before all data analysis was complete)—that the number of people victimized in the crime

19  that resulted in a life-sentence was not a statistically significant predictor of a person's likelihood

20  of being granted parole.  *See Predicting Parole Grants* at PDF pp. 3-4.  Subsequently, the authors

21  of *Predicting Parole Grants* confirmed that preliminary finding through their own statistical

22  analysis.  *Id.* at PDF p. 7 ("We looked at a number of characteristics related to the commission of

23  the life crime . . . [including] the charge (first degree murder, second degree murder, or 'other')

24  [and] whether the crime had more than one victim . . . .  To our surprise, none of these variables

25  was significantly correlated with release, suggesting that they exert no independent effect on

26  releasing authorities' decisions after controlling for other factors.  Insofar as we can determine

27  statistically, it appears that the commissioners' decisions are not based on the heinousness of the

28  life crime.").  Thus, contrary to the government's assertion, the materials presented by Mr. Ruiz

United States District Court
Northern District of California

16

1   indicate that someone convicted of even two counts of second-degree murder could also expect a

2   higher likelihood of parole in 2012 than he or she might have previously.  There is no evidence in

3   the record to the contrary.

4          To be sure, after *Lawrence* and *Shaputis*, the key inquiry in determining whether an

5   individual will be granted parole is whether an individual "will pose an unreasonable risk of

6   danger to society if released from prison."  Cal. Code Regs. tit. 15, § 2281(a).  As part of that

7   inquiry, the Board is directed to consider "[a]ll relevant, reliable information," including the "the

8   base and other commitment offenses."  *Id.* § 2281(b).  Specifically, factors like the existence of

9   multiple victims, the offense being "carried out in a dispassionate and calculated manner," and a

10  trivial motive in relation to the offense can all indicate unsuitability for parole.  *Id.* § 2281(c).

11  Nonetheless, the statistical findings in *Predicting Parole Grants* indicate that the underlying

12  charge and whether the crime involved multiple victims are *not* significantly correlated with

13  parole decisions, despite the fact that California regulations *permit* consideration of such factors.

14         Taking all of this information together, the unrebutted evidence suggests that Mr. Ruiz's

15  chances of parole—although there is some ambiguity as to the precise likelihood—would have

16  been significant, likely higher than 6%.  This is so for two reasons.  First, the 6% figure is a

17  dynamic one; as noted above, parole grant rates for lifers increased significantly after 2010 (the

18  year to which the 6% statistic applied).  Second, it appears that the 6% figure represented the

19  chance someone sentenced to life for murder would be paroled at a discrete parole hearing; since

20  someone sentenced to life is eligible for a subsequent parole hearing after a denial of parole in

21  three to fifteen years, Cal. Penal Code § 3041.5(b)(3), lifers will have multiple opportunities to be

22  granted parole, and thus the cumulative chance of obtaining parole and not serving life is likely to

23  be significantly greater than 6% over time.

24         The Court must next examine whether Mr. Cook's advice that Mr. Ruiz had no chance of

25  paroling if he accepted the plea offer constituted a "gross mischaracterization of the likely

26  outcome" of the potential plea bargain, *Iaea*, 800 F.2d at 865, and  "undermine[d] [Mr. Ruiz's]

27  ability to make an intelligent decision about whether to accept the plea offer," *Calderon*, 281 F.3d

28  at 880.  The Ninth Circuit has found that, in the inverse situation, where counsel advises a

United States District Court
Northern District of California

17

1    defendant that he or she will have a chance of parole, but no chance actually exists, the advice is a

2    gross mischaracterization of the likely outcome.  *See, e.g. Iaea*, 800 F.2d at 865 (finding gross

3    mischaracterization where, *inter alia*, counsel advised defendant "he might get probation" but

4    defendant was sentenced to life); *accord Meyers v. Gillis*, 142 F.3d 664, 667 (3d Cir. 1998)

5    (finding deficient performance under *Strickland* "where [petitioner] was informed that he would

6    become eligible for parole sometime in the future despite pleading guilty to a crime that carried a

7    mandatory period of life imprisonment as the only authorized sentence"); *cf. Scarbrough v.

8    Johnson*, 300 F.3d 302, 307 (3d Cir. 2002) (identifying an important difference between "life

9    without any possibility of parole" and a situation in which "the odds [of parole] may be slim . . .

10   [but] the possibility of parole from a life sentence does exist").  Although advising a defendant he

11   would have no chance of parole where a meaningful chance actually exists may implicate

12   somewhat different considerations than the inverse situation presented here, these cases presume

13   that a mischaracterization as to the availability of parole is significant, particularly where that

14   information is central to the defendant's decision whether to accept or reject a plea offer.  *Accord

15   Hill v. Lockhart*, 894 F.2d 1009, 1010 (8th Cir. 1990) (finding ineffective assistance where

16   counsel advised defendant that he would serve one-third of his sentence when the law actually

17   required one-half, and the defendant "had made clear that the timing of eligibility [for parole] was

18   the dispositive issue for him in accepting or rejecting a plea bargain").

19        Accordingly,  the erroneous advice Mr. Cook gave to Mr. Ruiz—that if he took the plea of

20   15 years to life he would have no chance of parole, advice which reinforced the similar erroneous

21   advice he had received from Mr. Cooper—undermined Mr. Ruiz's ability to make an intelligent

22   decision whether to accept the plea.  It thus constituted ineffective assistance under *Strickland*.  To

23   conclude that Mr. Ruiz did not receive such advice would have been an "unreasonable

24   determination of the facts in light of the evidence presented in the State court proceeding," 28

25   U.S.C. § 2254(d)(2), and a conclusion that such advice did not constitute ineffective assistance of

26   counsel would have been "an unreasonable application of, clearly established Federal law."

27   §1254(d)(1).

28

United States District Court
Northern District of California

18

2.      Misunderstanding of Lesser-Related Offense Instruction

To compound the problem, Mr. Cook also provided "erroneous advice on the possible effects of going to trial." *Iaea*, 800 F.2d at 865.  On this issue, Mr. Ruiz contends that Mr. Cook incorrectly advised him about the instructions the jury would receive if he went to trial.  Traverse at 9.

Mr. Ruiz asserts that Mr. Cook advised him that the jury would be given an instruction on the lesser-related offense of accessory after the fact, and that Mr. Cook pursued that as his defense at trial.  *Id.*  The accessory after the fact instruction would have afforded the jury an intermediate option between outright acquittal and conviction of first-degree murder.  Presumably (as numerous courts have determined, as discussed below), by offering the jury a middle option, such an instruction would have lessened the odds of the murder convictions.  However, in actuality and apparently unbeknownst to Mr. Cook, the jury could not be and would not be instructed on the lesser-related offense without the prosecutor's consent.  Ans., Exh. 10 at 26–27.  Prior to 1998, a defendant in California was entitled to jury instructions on lesser-related offenses under *People v. Geiger*, 35 Cal. 3d 510, 520 (1984).  However, in 1998, the California Supreme Court overturned *Geiger* in *People v. Birks*, 19 Cal. 4th 108, 136–37 (1998).  The law in California now requires the prosecutor to consent to a lesser-related offense jury instruction.  Absent that consent, the instruction *cannot* be given.  Mr. Ruiz alleges that Mr. Cook was ignorant of the law on this point when he advised Mr. Ruiz that a lesser-included defense instruction would be given at trial.

Petitioner claims that, because of Mr. Cook's ignorance of the change in law wrought by *Birks*, he "could not possibly have advised Petitioner correctly regarding presenting this defense at trial or the well-settled law restricting the instructions that jury would be given."  Ans., Exh. 10 at 26.  Petitioner asserts that it is "reasonably probable that Mr. Cook's failure to understand the current state of the law regarding instructions on Petitioner's sole theory of defense affected both Mr. Cook's presentation of the risks and benefits of proceeding to trial and Petitioner's understanding thereof."  *Id.* at 27.  Additionally, because Mr. Cook encouraged Petitioner to testify in accordance with the narrative that he was an accessory after the fact, Petitioner believes that his trial testimony was "rendered meaningless" by the unavailability of the lesser-related

19

offense.  *Id*. at 26.  Petitioner concludes: "Had I been advised that it was highly unlikely that the jury would be instructed on my theory of defense because the prosecution had to consent, that information would have [] affected my decision to go to trial."  Ruiz Decl. ¶ 5.

Petitioner's allegation that Mr. Cook incorrectly advised him about the lesser-related jury instruction is proven by the record evidence in addition to Petitioner's own statement.  *Cf. Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002) (holding that "[habeas petitioner]'s self-serving statement, made years later, that [trial counsel] told him that 'this was not a death penalty case' is insufficient to establish that [petitioner] was unaware of the potential of a death verdict").  At the close of evidence, Mr. Cook asked the judge for the accessory-after-the-fact instruction relying on the outdated precedent of *Geiger*; this request, evidencing counsel's ignorance of the applicable law, led the prosecutor to react with "shock and dismay," as revealed by the trial transcript:

> **The Court**: Okay.  When the issue came to me when we were going over the jury instructions on the record, you know, Mr. DeFerrari [the prosecutor] you were what I described as shock and dismay, because you were asking Mr. Cook for his authority and both of us remembered it as being *Geiger*.

Ans., Exh. 10F.  This colloquy corroborates Petitioner's assertion and ineluctably implies that the misadvice Mr. Cook provided to Petitioner was not a deliberate strategic decision, but instead the result of his ignorance of the law.[3]

The Supreme Court has repeatedly noted that where an attorney demonstrates ignorance of the law, his or her performance falls below "the range of competence demanded of attorneys in criminal cases."  *Hill v. Lockhart*, 474 U.S. 52, 56 (1985); *see also Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of

---

[3] Mr. Cook's own declaration is silent on whether he was aware of the correct law and what plea advice he would have given to Petitioner had he known that accessory after the fact was not an available charge.  *See* Cook Decl.  Respondent claims that "total avoidance of the subject suggests that he does not agree with petitioner's implication that Cook advised him to reject the plea offer."  Ans. at 13.  It is true that an ambiguous third-party declaration is not necessarily sufficient to corroborate a defendant's self-serving statement.  *See Rodelas v. Arnold*, No. 14-CV-05017-JST, 2016 WL 4073307, at *14 (N.D. Cal. Aug. 1, 2016) ("[T]rial counsel's declaration is ambiguous at best as to when trial counsel communicated the sixty-year maximum exposure to Petitioner.  Petitioner's self-serving statements are insufficient to establish his allegations.").  Mr. Cook had an opportunity to explain his position to the contrary, but he did not.

United States District Court
Northern District of California

unreasonable performance under *Strickland*.")  Where it comes to advising on jury instructions, defense counsel's performance will be considered deficient when his or her "errors with the jury instructions were not a strategic decision to forego one defense in favor of another," but instead "the result of a misunderstanding of the law."  *United States v. Span*, 75 F.3d 1383, 1390 (9th Cir. 1996)*; see also, e.g.*, *White v. Ryan*, 895 F.3d 641, 666 (9th Cir. 2018) ("A decision [by counsel] based on a misunderstanding of the law is not sound trial strategy."); *Sanchez v. Biter*, No. 15-01191-JVS (KS), 2016 WL 8732179, at *7 (C.D. Cal. Aug. 15, 2016), *report and recommendation adopted*, No. 15-01191-JVS (KS), 2016 WL 8738100 (C.D. Cal. Oct. 21, 2016) ("In a case where the defendant faced (and received) a sentence of life imprisonment, it falls below an objectively reasonable professional standard for defense counsel to not research what evidence is needed to establish lesser included offenses until right before the case goes to the jury.")  Where a trial attorney makes such a decision—based on a misunderstanding of the law, rather than a strategic calculation—that decision "receives no deference."  *Crace v. Herzog*, 798 F.3d 840, 852 (9th Cir. 2015) (quoting *Span*, 75 F.3d at 1387 ).  *Cf. United States v. Alferahin*, 433 F.3d 1148, 1161 (9th Cir. 2006) (finding deficient performance where attorney "did not intend strategically to forego the materiality instruction" but instead "had no idea that such an instruction was available to his client as a matter of right").  Clearly, counsel's advice, based on his misapprehension of law, was deficient under the first prong of *Strickland*.

Mr. Cook's error regarding the availability of a lesser-offense instruction was no small matter.  The availability of a lesser-included offense instruction can be highly consequential.[4]  As explained in *Crace*, "a lesser-included-offense instruction can affect a jury's *perception* of reasonable doubt: the same scrupulous and conscientious jury that convicts on a greater offense when that offense is the only one available could decide to convict on a lesser included offense if given more choices."  798 F.3d at 848 (quoting *Keeble v. United States*, 412 U.S. 205, 212–13

---

[4] In theory, the instruction could have been available to Petitioner if the prosecutor had consented. However, it was very unlikely that the prosecutor would have done so given that Petitioner had previously proposed pleading to accessory after the fact during negotiations and the prosecutor rejected the proposal.  *See* Ans., Exh. 10 at 21 ("The offense [accessory after the fact] was not charged by the prosecution and had been previously rejected in plea negotiations.").

(1973)) (emphasis in original).  *Crace* further noted that the Supreme Court has recognized that "a jury presented with only two options—convicting on a single charged offense or acquitting the defendant altogether—'is likely to resolve its doubts in favor of conviction' even if it has reservations about one of the elements of the charged offense, on the thinking that 'the defendant is plainly guilty of some offense.'"  *Id.* (quoting *Keeble*, 412 U.S. at 212–13).  "It is therefore perfectly plausible that a jury that convicted on a particular offense at trial did so despite doubts about the proof of that offense—doubts that, with 'the availability of a third option,' could have led it to convict on a lesser included offense."  *Id.* (quoting *Keeble*, 412 U.S. at 213).  *See also Beck v. Alabama*, 447 U.S. 625, 634–35 (1980) ("We cannot say that the availability of a third option-convicting the defendant of simple assault-could not have resulted in a different verdict.").

In this case, the jury had only two options:  outright acquittal or conviction of first-degree murder.  It is noteworthy that the jury took three days of deliberation to reach a verdict.  Ans., Exh 2 at 2.  This suggests that Mr. Ruiz's guilt or innocence was not an open-and-shut issue.  Ultimately, Petitioner was found guilty of two counts of special circumstance first-degree murder and was sentenced to 50 years and two consecutive life terms without the possibility of parole.  Given the length of deliberation, it is not an unrealistic possibility that the jury would have convicted Mr. Ruiz of accessory after the fact had it been given that option.

The instant case is similar to *Sanchez v. Biter*, mentioned above.  In *Sanchez*, the court found counsel's performance deficient for exhibiting an "inexcusable ignorance of criminal law."  2016 WL 8732179, at *8.  The petitioner there declined a plea offer and went to trial on an attempted murder charge because counsel assured him that he could be convicted of assault with a deadly weapon as a lesser-included offense, with a maximum possible sentence of 30 years.  *Id.* at *5.  But "assault with a deadly weapon is *not* a lesser included offense of attempted murder."  *Id.* at *8 (emphasis in original).  Relying on counsel's error, the petitioner "rejected a proposed plea agreement that would have secured him a 39-year *determinate* sentence instead of the 7 years plus 25 years to life *indeterminate* sentence that was imposed after trial."  *Id.* (emphases in original).  The court concluded that counsel "lacked adequate knowledge of California criminal law to provide constitutionally adequate assistance of counsel, particularly with respect to advising [the

petitioner] on how to weigh the possible consequences of trial versus a plea." *Id.* at *9.

Here, the record evidence shows that Mr. Cook's advice on the availability of lesser-included offense jury instructions was "so incorrect and so insufficient that it undermined the defendant's ability to make an intelligent decision about whether to accept the plea offer." *Calderon*, 281 F.3d at 880 (internal quotations omitted).  To compound matters, Mr. Ruiz was given misinformation on both sides of the decision whether to accept the plea.  Mr. Cook's erroneous advice about Mr. Ruiz's chances of paroling – even if one were to find that erroneous advice about the chance of parole alone did not constitute ineffective assistance – when combined with the erroneous advice about the availability of a jury instruction on the middle option of accessory after the fact, substantially undermined Mr. Ruiz's ability to make an intelligent decision about the plea.  By providing "erroneous advice on the possible effects of going to trial," *Iaea*, 800 F.2d at 865, Mr. Cook provided ineffective assistance, and the state court could not reasonably have concluded otherwise.  Thus, Mr. Cook's performance was deficient even under the deferential standard of *Strickland* and AEDPA.  In other words, it would have been an "unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), if the state court concluded that Mr. Ruiz was not erroneously advised on the issue of the lesser-included instruction.  It would also have been "an unreasonable application of [*Strickland*]," *id.* § 2254(d)(1), to conclude that such advice – especially combined with the misadvice on the possibility of parole if he took the plea – did not constitute ineffective assistance of counsel.

### 3.   Prejudice

Under the second prong of *Strickland*, Petitioner must also demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Strickland*, 466 U.S. at 687.  As explained above, in the plea context, a petitioner must show that but for the misadvice of counsel at trial, there is a "reasonable probability" that he would have accepted the plea, that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.  *Lafler*, 566 U.S. at 164; *see also In re Alvernaz*, 2 Cal. 4th 924, 937 (1992) ("a defendant must prove there is a reasonable

1    probability that, but for counsel's deficient performance, the defendant would have accepted the

2    proffered plea bargain").

3         The government asserts that the language of Mr. Ruiz's declaration is too "vague" to

4    demonstrate that he would have changed his decision to reject the plea offer had he been properly

5    advised by counsel on the issue of jury instructions.  Ans. at 15.  In his declaration, Mr. Ruiz

6    states:

7              Had Mr. Cook explained to me that if I had accepted the 15-to-Life
               offer, that there was a possibility I would be granted parole some
8              day, I would have accepted that offer and not proceeded to trial.
               Had I been advised that it was highly unlikely that the jury would be
9              instructed on my theory of defense because the prosecution had to
               consent, that information would have also affected my decision to
10             go to trial.

11   Ruiz Decl. ¶ 5.  The government contends that Mr. Ruiz "does not say he would have taken the

12   plea offer, only that the instruction would have 'affected' his decision."  Ans. at 15.  In essence,

13   the government's point highlights the fact that Mr. Ruiz's declaration discussed the issue of

14   counsel's parole advice separately from the issue of jury instructions, and while Mr. Ruiz notes

15   that he "would have accepted" the plea offer had he known there was a possibility that he would

16   be granted parole, he only states that proper advice about the jury instruction would have

17   "affected" his decision.  However, when read in the context of his entire declaration, it is clear that

18   Mr. Ruiz means that he would have taken the plea offer rather than proceeding to trial.  Mr. Ruiz's

19   use of the word "affected" is consistent with the fact that his entire declaration conveys that, had

20   he been properly advised, he would have accepted the plea offer, rather than proceeding to trial.

21        The government also challenges Mr. Ruiz's explicit assertion that he wanted to take the

22   plea offer extended to him but was dissuaded from doing so by Mr. Cook.  *Id.* at 24–25.  In Mr.

23   Ruiz's declaration, he states:

24             I was offered a plea to second degree murder with a sentence of 15-
               Life.  I wanted to take it, but when I asked Mr. Cook what he
25             thought, he said that he had never heard of a lifer paroling and that
               we should go to trial because he believed I had a 50/50 chance if I
26             went up and testified.

27   Ruiz Decl. ¶ 4.  In response, the government contends:

28             [P]etitioner declares that, for years, both of his attorneys advised

> him not to take an indeterminate plea offer.  Yet, when such an offer
> was made, he claims he wanted to take it.  Petitioner offers no
> explanation why he was inclined to disregard his attorneys' advice,
> nor how he was persuaded to change his mind.  Moreover, petitioner
> undoubtedly talked to family and fellow prisoners about whether to
> take the plea offer.  Yet, he has not presented a single declaration to
> corroborate his claims that he was advised to reject any
> indeterminate term plead deal; that he, nevertheless, wanted to take
> the plea offer; and that he was convinced otherwise.

Ans. at 24–25.

While it is true that Mr. Ruiz was focused on securing a determinate sentence prior to trial, *see* Hoveland Decl. ¶ 9 ("Kellin Cooper . . . relayed to me via phone that he actively attempted to negotiate a plea deal for a determinate term sentence for petitioner during the course of his representation of him."); *id.* ¶ 10 ("Mr. Cook believed that Petitioner only wanted a determinate term sentence and did 'not remember talking to him that much about an indeterminate term' because Cook 'was just trying to get a determinate term.'"),  Mr. Ruiz's state of mind was subject to the influence of erroneous information about the possibility of parole he had received from both Mr. Cooper and Mr. Cook.  The relevant inquiry is whether there is a "reasonable probability" that, but for counsel's ineffective assistance and bad advice, Mr. Ruiz would have taken the plea.

The government also contends that the state court might have been skeptical of Mr. Ruiz's claims that he would have accepted a plea in light of the fact that he maintained his innocence throughout trial.  Specifically, he testified that he had no knowledge of the murders until after they happened.  Exh. 7 at 8.  However, the decision whether to accept a plea offer often turns on more than an individual's guilt or innocence.  While the California Supreme Court has noted that "a defendant's trial protestations, under oath, of complete innocence may detract from the credibility of a hindsight claim that a rejected plea bargain would have been accepted had a single variable (sentencing advice) been different," *Alvernaz*, 2 Cal. 4th at 940, here, Petitioner has demonstrated more than one error by counsel.  He was given incorrect advice about both the potential benefit of the plea offer (which erroneously misled Mr. Ruiz about the real possibility of parole) and the risks of going to trial (which led Mr. Ruiz to believe the jury would be given a lesser-included instruction).

The question of prejudice in this context is not whether it is more likely than not that Mr.

25

Ruiz would have taken the plea, but whether there is "reasonable probability" that, absent the two-pronged error committed by counsel, Mr. Ruiz would have taken the plea.  Given the record evidence and the magnitude of the error, the state court could not reasonably have found that Mr. Ruiz was not so prejudiced.  A conclusion that Mr. Ruiz was not prejudiced would have been an "unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2).  Further, the fact that the prosecutor left the plea offer open until the start of trial establishes without doubt that the government would not have withdrawn the offer, had Mr. Ruiz accepted it.  There is no evidence that intervening circumstances would have led the government to a different decision.  *See Lafler*, 566 U.S. at 163–64.  Nor, given the trial court accepted similar pleas of his co-defendants, s*ee* Ans. at 27, is there any doubt that the Court would have accepted Mr. Ruiz's plea.  *Lafler*, 566 U.S. at 163–64.

## V.      CONCLUSION

For the foregoing reasons, Mr. Ruiz's habeas petition is **GRANTED**.  Mr. Ruiz was denied effective assistance of counsel and was prejudiced thereby.  The District Attorney of Contra Costa County is ordered to reinstate the offer of February 18, 2012.  *See Lafler*, 566 U.S. at 174 ("The correct remedy in these circumstances . . . is to order the State to reoffer the plea agreement.").

**IT IS SO ORDERED**.

Dated: August 10, 2020

_____
EDWARD M. CHEN
United States District Judge