1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    IGNACIO RUIZ,                              Case No. 18-cv-07681-EMC

8                    Plaintiff,

9            v.                                 ORDER DENYING DEFENDANT'S
                                                MOTION TO ALTER OR AMEND
10   M. ELIOT SPEARMAN,                         JUDGMENT

11                   Defendant.                 Docket No. 15

12

13

14           On August 13, 2020, this Court granted Petitioner Ignacio Ruiz's petition for a writ of

15   habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction from Contra Costa County

16   Superior Court.  Docket No. 14 ("Order").  Respondent M. Eliot Spearman ("the government")

17   filed a motion to alter or amend the judgment and request for evidentiary hearing pursuant to

18   Federal Rule of Civil Procedure 59(e).  Docket No. 15 ("MTA").  The Court granted the

19   government's request for an evidentiary hearing to determine what Daniel Cook, Mr. Ruiz's trial

20   counsel, advised Mr. Ruiz regarding (1) the likelihood of parole had Mr. Ruiz pled to two second-

21   degree murder charges with indeterminate sentences of fifteen years to life, and (2) the availability

22   of a defense at trial based on a lesser included offense of accessory after the fact, as well as (3)

23   whether Mr. Ruiz was prejudiced by Mr. Cook's advice.  Docket No. 26.

24           On January 6 and 9, 2023, this Court held an evidentiary hearing and received testimony

25   from Mr. Cook and Mr. Ruiz.  Following the evidentiary hearing, the Court now considers the

26   government's Motion to Alter or Amend the Judgment.  The Court **DENIES** the motion.

27              I.        **FACTUAL AND PROCEDURAL BACKGROUND**

28           Mr. Ruiz was charged with conspiracy to commit murder (Cal. Penal Code §§ 182 (a)(1),

187), two counts of first-degree murder (Cal. Penal Code § 187) with multiple special circumstance allegations (Cal. Penal Code §§ 190.2(a)(3), (a)(22)), and active participation in a criminal street gang (Cal. Penal Code § 186.22(a)).  Amended Habeas Order at 1.  The charges included firearm enhancement allegations (Cal. Penal Code § 12022.53) and alleged that the conspiracy and murder counts were committed for the benefit of a criminal street gang (Cal. Penal Code § 186.22).  Amended Habeas Order at 1.  The first-degree murder charges carried a sentence of life imprisonment without the possibility of parole.

Mr. Ruiz was represented pretrial by Kellin Cooper until 2010, then by Daniel Cook from 2010 onwards.  Mr. Cook represented Mr. Ruiz at trial.  Amended Habeas Order at 3.  In 2012, the District Attorney offered a pretrial plea of two counts of second-degree murder for a sentence of 15 years to life.  Amended Habeas Order at 3.  Based on Mr. Cook's advice that: (1) no lifers ever received parole (advice consistent with Mr. Cooper's earlier statement to Mr. Ruiz that "if he took a plea that did not include a guaranteed release date he would never be paroled," Docket No. 58-1 Exh. 1 (Declaration of Kellin Cooper ("Cooper Decl.")) ¶ 5), and (2) he could rely on an accessory-after-the-fact instruction at trial (which would have permitted the jury to convince on a lesser offense), Mr. Ruiz rejected the deal.  MTAJ at 1.  Mr. Ruiz proceeded to trial.  The trial judge rejected Mr. Cook's request for the lesser offense jury instruction.  Mr. Ruiz was convicted of two counts of first-degree murder, conspiracy to commit murder, and active participation in a criminal street gang, with multiple murder and gang special circumstances and gang and firearm enhancements.  *See* Cal. Penal Code §§ 182(a)(1), 186.22(a) & (b)(1)), 187, 190.2(a)(3), (a)(22), 12022.53(b)–(d)).  Mr. Ruiz was then sentenced to 50 years to life and two consecutive terms of life without parole.  Amended Habeas Order.  The California Court of Appeal affirmed the judgment on direct appeal.  Amended Habeas Order at 4.  The California Supreme Court denied Mr. Ruiz's petition for review on June 29, 2016.  Docket No. 7-5.

Mr. Ruiz filed a habeas petition directly before the California Supreme Court, asserting ineffective assistance of counsel via his counsel's misadvice on the law regarding parole and the lesser-related offense instructions.  That petition was denied on December 19, 2018, without any comment.  Docket No. 7-6.

United States District Court
Northern District of California

1        Two days later, Mr. Ruiz filed a habeas petition with this Court, arguing that (1) Mr. Cook

2 erroneously told him that if he accepted the plea to second-degree murder with an indeterminate

3 sentence, there was no real possibility he could be granted parole as an effective life sentence, and

4 (2) Mr. Cook incorrectly advised him that if he went to trial, the jury would be given an

5 instruction on the lesser-related offense of accessory after the fact, which would have afforded the

6 jury an intermediate option between outright acquittal and conviction on first-degree murder.

7 Docket No. 1.  The government filed a response.  Docket No. 7.  This Court granted the petition

8 on August 10, 2020, and amended the order with clerical additions on August 13, 2020.  Docket

9 No. 13, 14.  The Court explained that Mr. Ruiz's trial counsel Mr. Cook, provided ineffective

10 assistance by misadvising Mr. Ruiz that (1) Mr. Ruiz should reject the plea offer of 15 years to life

11 because no lifers ever received parole, and (2) that Mr. Ruiz could rely on an instruction on

12 accessory after the fact at trial.  The Court found that the erroneous advice was prejudicial because

13 there is a reasonable probability that petitioner would have accepted the plea offer absent the

14 advice.  The Court formally entered judgment for Mr. Ruiz several months later, on March 22,

15 2021.

16        The government filed a motion to alter or amend the judgment and request for an

17 evidentiary hearing on September 10, 2020.  Docket No. 15 ("MTA"); Docket No. 20 ("Opp.");

18 Docket No. 21 ("Repl.").  The government argued that the Court erred in reaching its findings and

19 requested that the Court amend its judgment and order an evidentiary hearing to determine the

20 disputed facts surrounding the claims.  *Id.*

21        The Court granted the government's motion for an evidentiary hearing on the issues to

22 what Mr. Ruiz's trial counsel Mr. Cook advised Mr. Ruiz regarding (1) the likelihood of parole

23 had Mr. Ruiz accepted the pretrial plea deal and (2) the availability of a defense at trial based on a

24 lesser included offense of accessory after the fact; and (3) whether Mr. Ruiz was prejudiced by

25 Mr. Cook's erroneous advice.  Docket No. 26 ("Order Granting Evidentiary Hearing").  The Court

26 held an evidentiary hearing on January 6 and 9, 2023.  It heard testimony from Mr. Cook and Mr.

27 Ruiz and admitted various exhibits.

28

United States District Court
Northern District of California

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 59(e) reads: "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."  A Rule 59(e) motion may be granted where: (1) the motion is necessary to correct manifest errors of law or fact upon which a judgment is based; (2) the moving party presents newly discovered or previously unavailable evidence; (3) the motion is necessary to prevent manifest injustice; or (4) there is an intervening change in the controlling law.  *McDowell v. Calderon*, 197 F.3d 1253, 1254 n.1 (9th Cir. 1999) (en banc).

This rule "enables a district court to rectify its own mistakes in the period immediately following its decision, but not to address new arguments or evidence that the moving party could have raised before the decision."  *Banister v. Davis*, 140 S. Ct. 1698, 1700 (2020) (internal citation omitted).  The Ninth Circuit has held that a Rule 59(e) motion "should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law."  *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999) (citing *School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)); *see also McDowell v. Calderon*, 197 F.3d 1253, 1254 n.1 (9th Cir. 1999).  "A Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation."  *Kona Enters. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).  "While Rule 59(e) permits a district court to reconsider and amend a previous order, the rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources."  *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (internal quotation marks omitted).

## III.     DISCUSSION

A.     Timeliness of Rule 59(e) Motion

As a preliminary procedural matter, the parties contest whether the government's motion was timely filed.  A motion to alter or amend the judgment must be filed "no later than 28 days after the entry of the judgment."  Fed. R. Civ. P. 59(e).  This Court issued the original order on August 10, 2020, amended the order on August 13, 2020, and formally entered judgment on

March 22, 2021.  The government filed its motion to amend or alter the judgment on September 10, 2020.

Mr. Ruiz argues that the government's motion was untimely as measured from the date of the original order on August 10, 2020—31 days, outside the 28-day window under Rule 59(e).  Docket No. 58 at 20.  The government argues that its motion was timely as measured from the date of entry of judgment on March 22, 2021, and that thus the motion was filed within the 28-day window, indeed prior to the judgment's filing.  Docket No. 21 at 4.

The government's motion is timely.  Rule 59(e) expressly requires that the 28-day window for the motion to amend begins after an "entry of judgment."  Fed. R. Civ. P. 59(e).  Rule 58 considers judgment entered "when the judgment is entered in the civil docket under Rule 79(a) and the earlier of these events occurs: (A) it is set out in a separate document; or (B) 150 days have run from the entry in the civil docket."  Fed. R. Civ. P. 58.  The August 10, 2020, and August 13, 2020, orders were not judgment as defined by Rule 58.  The government's motion to amend is timely.

B.   Ineffective Assistance of Counsel

1.   Standard of Review

Having found that the government's motion is timely, this Court considers the motion to alter or amend judgment.  A Rule 59(e) motion may be granted where: (1) the motion is necessary to correct manifest errors of law or fact upon which a judgment is based; (2) the moving party presents newly discovered or previously unavailable evidence; (3) the motion is necessary to prevent manifest injustice; or (4) there is an intervening change in the controlling law.  *McDowell*, 197 F.3d at 1254 n.1.  Here, the Rule 59(e) motion is warranted to prevent manifest injustice resulting from a determination of disputed facts without giving the parties an opportunity to present live testimony on the critical question of what advice was given to Mr. Ruiz and whether any ineffective assistance prejudiced Mr. Ruiz, questions that turn on witness credibility.  Disputed facts of this nature warranted an evidentiary hearing which this Court had not previously held.  *See Cullen v. Pinholster*, 563 U.S. 170, 205 (2011) (Breyer, J., concurring and dissenting in part) (holding that an evidentiary hearing may be needed when the state court failed to meet the

5

1    requirements of § 2254(d)).

2          For that same reason, an evidentiary hearing was proper under the Antiterrorism and

3    Effective Death Penalty Act of 1996 ("AEDPA").  Under AEDPA, a federal court may only grant

4    habeas relief for claims adjudicated on the merits in state court proceedings if either (1) the

5    adjudication "resulted in a decision that was contrary to, or involved an unreasonable application

6    of, clearly established Federal law, as determined by the Supreme Court of the United States," or

7    (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of

8    the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Reynoso v.*

9    *Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006).  State court factual determinations are generally

10   accorded "substantial deference."  *Brumfield v. Cain*, 576 U.S. 305, 314 (2015).  The Ninth

11   Circuit has summed up the standard of review of state court decisions under § 2254(d)(2):

12               First, challenges to purely factual questions resolved by the state
                 court are reviewed under § 2254(d)(2); the question on review is
13               whether an appellate panel, applying the normal standards of
                 appellate review, could reasonably conclude that the finding is
14               supported by the record. Second, fact-based challenges founded on
                 evidence raised for the first time in federal court are reviewed under
15               § 2254(e)(1); the question on review is whether the new evidence
                 amounts to clear and convincing proof sufficient to overcome the
16               presumption of correctness given the state court's factual findings.
                 Third, challenges to purely legal questions resolved by the extant
17               state court are reviewed under § 2254(d)(1); the question on review
                 is (a) whether the state court's decision contradicts a holding of the
18               Supreme Court or reaches a different result on a set of facts
                 materially indistinguishable from those at issue in a decision of the
19               Supreme Court; or (b) whether the state court, after identifying the
                 correct governing Supreme Court holding, then unreasonably
20               applied that principle to the facts of the prisoner's case. And, fourth,
                 challenges to mixed questions of law and fact receive similarly
21               mixed review; the state court's ultimate conclusion is reviewed
                 under § 2254(d)(1), but its underlying factual findings supporting
22               that conclusion are clothed with all of the deferential protection
                 ordinarily afforded factual findings under §§ 2254(d)(2) and (e)(1).
23

24   *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004).

25          Thus, under AEDPA, this Court must consider whether the state court's factual findings on

26   ineffective assistance of counsel are reasonably supported by the record before the state court.

27   Here, the state court merely issued a denial without comments of Mr. Ruiz's habeas petition.

28   Docket No. 7-6 (In full: "The petition for writ of habeas corpus is denied.").  When "no reasoned

state court decision denying a habeas petition exists, this court must assume that the state court has decided all the issues and perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable." *Reynoso*, 462 F.3d at 1109 (cleaned up). However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief.  A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Such is the case here.

The state court made an objectively unreasonable decision because it did not adjudicate the ineffective-assistance-of-counsel issue (and the disputed factual issues at the heart of the claim) based on a developed factual record.  *See Wiggins v. Smith*, 539 U.S. 510, 527–28 (2003) (holding that the state court's decision rejecting the petitioner's ineffective assistance claim was "objectively unreasonable" and unsupported by sufficient evidence in the state record because "the court did not conduct an assessment of whether [counsel's] decision . . . actually demonstrated reasonable professional judgment" and "merely assumed" that the evidence was adequate).  The state court could not have determined credibility critical to the ineffective assistance claim in this case based solely on the documentary evidence in the record.  *See Earp v. Ornoski*, 431 F.3d 1158, 1169–70 (9th Cir. 2005) ("In rare instances, credibility may be determined without an evidentiary hearing where it is possible to 'conclusively' decide the credibility question based on 'documentary testimony and evidence in the record.'") (citing *Watts v. United States*, 841 F.2d 275, 277 (9th Cir.1988)); *id.* at 1170 ("[T]here is no evidentiary basis for the district court's judgment of [the witness]'s incredibility because [the witness]'s story is completely outside the record.").

Accordingly, when "the state court's decision was based upon an unreasonable determination of the facts, we are not constrained by the record before the state court, and may consider evidence presented for the first time in federal court." *Velasquez v. Ndoh*, 824 F. App'x 498, 501 (9th Cir. 2020) (reversing and remanding for an evidentiary hearing).  The Ninth Circuit held in *Earp v. Ornoski*, "it is evident from the record that [the defendant] has never received an

opportunity to develop his claim of prosecutorial misconduct. . . . neither the state court nor the district court allowed him an evidentiary hearing. Because we find that such a hearing was necessary to make the credibility determination upon which rejection of [the defendant]'s claim depends, we conclude that he has not had a 'full and fair' opportunity to develop the facts supporting his claim, and, consequently, the state court decision summarily denying him habeas relief was based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2)." 431 F.3d 1158, 1169 (9th Cir. 2005) (internal citations omitted).

*Shinn v. Ramirez* does not bar this Court's decision to hold an evidentiary hearing. There, the Supreme Court held that AEDPA's exhaustion requirement and the doctrine of procedural default "generally prevents federal courts from hearing any federal claim that was not presented to the state courts consistent with the State's own procedural rules." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1724 (2022). But *Shinn* does not bar an evidentiary hearing where, as here, the petitioner did present the ineffective assistance claim in the state court supported by a written record but was not given an opportunity to present testimony evidence pivotal to the determination of material facts.[1] Accordingly, it was appropriate for this Court to conduct an evidentiary hearing to elicit testimony regarding the ineffective-assistance-of-counsel at issue herein.

2.    Ineffective Assistance of Counsel

The Court turns to the merits issue of whether Mr. Cook provided ineffective assistance of counsel. The Supreme Court has held that a petitioner must show that (1) "the counsel's performance was deficient," that it "fell below an objective standard of reasonableness under prevailing professional norms," and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). The "deficient performance" prong

---

[1] There was no procedural default in the state courts by Mr. Ruiz. Moreover, *Shinn* applies to evidentiary hearings requested by *petitioners*, not *respondents*: "If a prisoner has failed to develop the factual basis of a claim in State court proceedings, a federal court shall not hold an evidentiary hearing on the claim unless the prisoner satisfies one of two narrow exceptions, see 28 U.S.C. § 2254(e)(2)(A), and demonstrates that the new evidence will establish his innocence by clear and convincing evidence, § 2254(e)(2)(B). *Id.* at 1728. Section 2254(e)(2) limits only petitioners' requests for evidentiary hearings. In the instant case, it is the respondent—the government—who requests an evidentiary hearing to develop the record.

United States District Court
Northern District of California

requires a defendant to demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* Counsel's conduct falls below professional norms if counsel's advice constituted both a "gross mischaracterization of the likely outcome . . . combined with . . . erroneous advice on the possible effects of going to trial." *Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir. 1986). The "prejudice" prong requires that the defendant demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In the context of ineffective assistance in advising a defendant on a plea offer, prejudice is demonstrated if it is shown there is a reasonable probability, *inter alia*, that the defendant would have accepted the plea.

"The standards created by *Strickland* and Section 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Sanders v. Cullen*, 873 F.3d 778, 814 (9th Cir. 2017). In most circumstances, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. . . . A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). As explained above, the double deference standard does not bar this Court's review here because the state court's determination was unreasonable since disputed questions of fact as to what precise advice Mr. Cook provided to Mr. Ruiz were not fully resolved. The Court now considers the ineffective-assistance-of-counsel issue based on the state court record and the evidence elicited from the evidentiary hearing. For the reasons discussed below based on the totality of the evidence, the Court finds there is clear and convincing proof which overcomes the presumption of correctness given the state court's implicit findings.

      a.   <u>Mr. Cook's Advice on Likelihood of Parole</u>

"[T]he decision to reject a plea bargain offer and plead not guilty is also a vitally important decision and a critical stage at which the right to effective assistance of counsel attaches." *United States v. Zelinsky*, 689 F.2d 435, 438 (1982). A defendant can establish deprivation of effective assistance of counsel if he demonstrates "that the advice he received was so incorrect and so

United States District Court
Northern District of California

insufficient that it undermined his ability to make an intelligent decision about whether to accept the plea offer." *Turner v. Calderon*, 281 F.3d 851, 880 (9th Cir. 2002) (cleaned up). "[A] defendant has the right to make a reasonably informed decision whether to accept a plea offer." *Id.* (internal citations omitted). Having considered the state court record and the evidence submitted in support of Mr. Ruiz's petition, along with the testimony at the evidentiary hearing, the Court finds Mr. Cook grossly mischaracterized the likely outcome of accepting the plea offer by failing to inform Mr. Ruiz of the possibility of parole and instead permitted Mr. Ruiz to labor under the misimpression that there would be no possibility of parole if he was sentenced to second-degree murder under the plea.

In the initial stages of litigation, Mr. Cooper's advice set the stage for Mr. Ruiz's understanding (or, more accurately, his misunderstanding) of the plea offer and its likely consequences. In his declaration, Mr. Cooper stated that he "believe[s] that an indeterminate sentence is essentially the same as a sentence of life without the possibility of parole" and thus "did not believe there was any realistic hope that a defendant with gang allegations would ever be paroled regardless of the length of the indeterminate term." Cooper Decl. ¶¶ 7, 9. Mr. Cooper conveyed this sentiment to Mr. Ruiz, stating that he "explained the difference between a determinate term and an indeterminate term" and "advised [Mr. Ruiz] that if he took a plea that did not include a guaranteed release date he would never be paroled." *Id.* ¶ 5; Transcript II at 17 ("Q. Mr. Cooper told you that you didn't – that he didn't think you would ever get out on parole; is that right? A. Something to that effect, yes."). Mr. Ruiz was under the impression that the plea offered no chance of "anybody getting out." Transcript I at 115 (Mr. Ruiz stating: "Well, why would I take that, you know, if I have another attorney telling me a month prior that it's still a life sentence; that he has never seen anybody or heard of anybody getting out. So at that point in time when the offer was relayed to me, yes, I didn't – I didn't plan on taking anything at that moment with a life."). This is not disputed as the government presented no contrary evidence.

After Mr. Cook took over the representation from Mr. Cooper prior to trial, Mr. Cook essentially confirmed that advice. Mr. Ruiz stated in his declaration that he "was offered a plea to second degree murder with a sentence of 15-Life" that he "wanted to take," but that Mr. Cook had

1   told him that "he had never heard of a lifer paroling" and that "[h]ad Mr. Cook explained to me

2   that if I had accepted the 15-to-Life offer, that there was a possibility I would be granted parole

3   some day, I would have accepted that offer and not proceeded to trial."  Docket No. 7-5

4   (Declaration of Ignacio Ruiz ("Ruiz Decl.")) ¶¶ 4–5; Transcript I at 117 (Mr. Ruiz stating: "And I

5   remember [Mr. Cook], you know, very clearly saying that he has never seen a lifer get out when

6   referring to that 15 to life, which was my, you know, basically like I said, the stamp on my

7   decision . . .").

8          Having now heard the live testimony of Mr. Cook and Mr. Ruiz, the Court credits Mr.

9   Ruiz's account.  In the evidentiary hearing, although Mr. Cook testified that he did not remember

10   the specifics of his conversations with Mr. Ruiz, he thought he may have said that "at least there's

11   hope" for parole; but, he said nothing to give Mr. Ruiz there was any realistic hope of parole.  In

12   fact, Mr. Cook led Mr. Ruiz to believe that any such request by Mr. Ruiz would be denied in a

13   plea hearing because Mr. Cook told him that "no lifers get out on parole."  Transcript II at 17 ("Q.

14   Did Mr. Cook ever tell you he did not – that no lifers get out on parole?  A. That is correct. Right

15   before our trial, this is one of the last conversations that I remember before going to trial when I

16   asked – when it was getting so close, when I asked him what he – what he would recommend for

17   me to do. And his initial statement was well, that he has never seen a lifer get out. So at the end of

18   the day it's up to me to give my story and maybe there is a slim chance that we can get somebody

19   to believe, something to that effect.").  Mr. Ruiz's testimony about the advice given to him by Mr.

20   Cooper and Mr. Cook was credible.  It was not contradicted by any testimony from Mr. Cooper or

21   Mr. Cook and was entirely consistent with what appeared to be the pervasive belief of attorneys in

22   the public defender's office.  Transcript I at 54 ("Q. Would it surprise you to know that Ms.

23   Brackman said that at the time the general sentiment in the Public Defender's Office was that

24   indeterminate terms were not – that indeterminate terms were basically the same as the life

25   without possibility of parole and they were not recommending them for anyone, even in 2012?  A.

26   Like I said before, I'm not aware of what the general sentiment in the Public Defender's Office

27   was at that time or what Public Defenders were recommending to their clients."); Docket No. 58-1

28   Exh. 2 (Declaration of Rebecca Brackman ("Brackman Decl.")) ¶ 5 ("At the time I represented

United States District Court
Northern District of California

11

Mr. Miranda, the culture and belief in the Public Defender's Office was that life defendants had a very, very slim chance of ever being paroled. At that time, our office generally recommended against taking plea offers with life terms. No one in my office was advising defendants to accept indeterminate sentences because we believed they did not provide a realistic opportunity for parole.").

The collective advice that Mr. Ruiz received from Mr. Cooper and Mr. Cook left him with the clear impression that accepting the plea would result in life imprisonment with no reason to hope for a chance of parole.  Transcript II at 24 ("Q. So by the time Mr. Cook was representing you, you had the understanding that there was no difference between a year to life term and a life without parole term; right?  A. I was already – yeah, I guess you can say that from my initial conversations with Cooper and Cook's basically verification, that kind of led me to that point but yes.").  That Mr. Ruiz was left with that impression was entirely consistent with his testimony that he wanted a plea offer that had "a number"—a finite limit on his prison time, not life imprisonment.  Transcript II at 23 (Mr. Ruiz stating: "[Y]ou hear throughout [the jail] like, you know, you definitely want to get something with a number. Get a number or else.").  As Mr. Cook testified, Mr. Ruiz's resistance to a life sentence was readily apparent to him; he suspected Mr. Ruiz's understanding (about never being paroled if sentenced to an indeterminate life sentence) may have been influenced by jailhouse lawyers.  Transcript I at 30 (Mr. Cook stating: "I know that he is adamant about not accepting anything with the potential life sentence . . . I probably was concerned that he was maybe getting some advice from jailhouse lawyers.").

Mr. Cook did nothing to disabuse Mr. Ruiz about the realistic prospects of parole, even for those convicted of second-degree murder.  Importantly, Mr. Cook did not inform Mr. Ruiz of the significant changes in law of parole brought by the California Supreme Court's decision in *In re Lawrence*, 44 Cal. 4th 1181 (2008) and *In re Shaputis*, 44 Cal. 4th 1241 (2008).  He did not explain to Mr. Ruiz the critical change in the law regarding parole and regulations governing parole board decisions.  Under prior law, a parole board or governor could deny parole based solely on the seriousness of the offense of conviction, an unchangeable fact.  Docket No. 58-11 Exh. 9 (Carrie L. Hempel, Lawrence *and* Shaputis *and Their Impact on Parole Decisions in*

*California*, 22 FED. SENT'G REP. 176 (2010)).  In 2008, the California Supreme Court in *In re Lawrence* lowered the standard for granting parole by diminishing the importance of the underlying offense and increasing the emphasis on a defendant's *current* dangerousness and behavior in prison.  *See In re Lawrence*, 44 Cal. 4th 1181 (2008).  The same day, the Court held the same in *In re Shaputis*, focusing on the defendant's *current* threat to public safety.  *See In re Shaputis*, 44 Cal. 4th 1241 (2008).  These changes in law shifted the focus of the parole inquiry from the egregious of the defendant's past crime to the current dangerousness of the defendant in the present day, thus providing courts greater latitude to find due process violations in parole denials.  Docket No. 58-11 Exh. 9 at 178.

Following that change in the law, there was a substantial uptick of grants of parole since 2008, both as an absolute number and as a percentage of requests; most of these grants would be for inmates convicted of murder because they resulted in life indeterminate sentences.  *See, e.g.*, Docket No. 58-11 Exh. 8 (Suitability Hearing Summary Calendar Year 1978 through Calendar Year 2021) (listing, for instance, 119 parole grants of 6177 suitability hearings in 2007, as compared to 1424 parole grants of 8722 suitability hearings in 2021); Docket No. 58-11 Exh. 9 at 178 ("Since the Court's decision in *Lawrence*, sixteen courts of appeal have applied the clarified some evidence standard to evaluate the legality of a parole denial. . . . Post-*Lawrence* decisions have granted petitions in cases in which the Parole Board has failed to articulate a rational nexus between the stated grounds for the decision and current dangerousness.").  Yet, there is no evidence that Mr. Cook explained to Mr. Ruiz this change in parole law and the uptick in parole grants.  Indeed, Mr. Cook indicated in the evidentiary hearing that he did not remember whether he had read *Lawrence* and *Shaputis*.  There is no indication that Mr. Cook made any attempt to do any research or consult with anyone who was familiar with the parole process and current trends.  Unsurprisingly, Mr. Cook was forthright in conceding he was "pretty confident that [he] didn't discuss any specific case law regarding parole with Mr. Ruiz."  Transcript II at 39.

As a result, Mr. Cook did not explain to Mr. Ruiz that he could have benefitted from the change in parole law.  In particular, he did not explain to Mr. Ruiz the suitability factors for release the Parole Board was to consider under the new criteria and the fact Mr. Ruiz would have

scored well on many if not most of them.  *See* Cal. Code Regs. tit. 15, § 2281(C) (listing suitability factors including heinousness of the crime, previous record of violence, unstable social history, sadistic sexual offenses, psychological factors, and institutional behavior in prison). Again, Mr. Cook admitted that he did not review the suitability factors himself nor with Mr. Ruiz. Transcript I at 41 ("Q. Did you ever go over the factors from 15 CCR, California Code of Regulations, Section 2402, with Mr. Ruiz?  A. I don't recall having done so.  Q. Did you ever go over them yourself?  A. I don't recall having done so.").  Mr. Ruiz credibly testified that Mr. Cook did not explain the suitability factors to him.  Transcript I at 120–21 ("Q. Did Cook go over any of the sort of factors that the parole board would consider if you eventually went up for a parole hearing?  A. No. That was definitely not something that was brought up."); Transcript I at 122 ("Q. Did Cook ever tell you that the function of the parole board is to determine whether the inmate is currently dangerous at the time he or she is appearing in front of the parole board?  A. No, I don't remember anything like that ever being said, no."); Transcript II at 8–9 ("Q. [D]id Cook ever talk to you about the fact that over time the significance of the commitment offense would be less important to a parole board?  A. No, we never talked about board requirements or strategies or anything like that with Mr. Cook.").  Critically, Mr. Cook did not point out to Mr. Ruiz the fact that Mr. Ruiz would very likely have scored well on the Parole Board's suitability factors: as Mr. Ruiz testified, he had no disciplinary problems while in county jail, had no disciplinary problems while in CDCR custody, had no serious rules violations, had no verbal warnings, engaged in positive programming since being in prison, and maintained close relationships with his family.  Transcript II at 10–11.  Each of these facts would have weighed in favor of obtaining parole.  In sum, unbeknownst to Mr. Ruiz, parole was a real possibility. Transcript I at 47 ("Q. So given all the positive things you have had to say about Mr. Ruiz and everything you knew about him in terms of his dropping out of the gang, his relationship with his family, his general demeanor, lack of criminal history or significant criminal history, the absence of violent history, his age, his remorse, do you think those would have all been advantageous when he was being assessed for current dangerousness 15 years later in front of the parole board? A. [Mr. Cook:] . . . I can't imagine any of those things would hurt him.").

1   Mr. Cook was clearly aware of Mr. Ruiz's mistaken impression that an indeterminate plea

2   meant that he had no possibility of parole.  Transcript II at 28 ("THE COURT: Okay. Did you

3   ever say anything to Cook about you didn't want to take an indeterminate plea because you assume

4   that meant the same thing as life; that you would never get out?  THE WITNESS: That was my

5   stance, yeah, I'm sure that I mentioned that to Cook.  THE COURT: Okay. And did he ever

6   disagree with you when you said that, saying something like no, that's not true it is possible to get

7   out? You are wrong?  THE WITNESS: No, that was never his style, no.").  Yet, he did nothing to

8   disabuse Mr. Ruiz of his critical misapprehension.

9       Based on the evidence and the witness testimony at the evidentiary hearing, the Court

10  affirms its previous determination that Mr. Cook's conduct fell outside the range of reasonable

11  professional assistance in regard to his advice on the plea, but this time does so after considering

12  all the evidence including the testimony of the critical witnesses.  The net effect of Mr. Cook's

13  advice regarding the plea (leaving Mr. Ruiz to believe there was no prospect of parole) was to

14  convince Mr. Ruiz to reject the plea.  Transcript I at 121 (Mr. Ruiz stating: "I made the

15  assumption that his definite opinion was – was don't take it, by him remarking that he has never

16  seen a lifer get out.").  Mr. Ruiz credibly testified that, had Mr. Cook provided comprehensive

17  advice and "explained to [Mr. Ruiz] that given [his] lack of criminal history, [his] close

18  relationships with [his] family, [his] improving [himself] in prison doing positive programming,

19  focusing on [his] insight and [his] remorse, that [he] would have a realistic shot at parole," Mr.

20  Ruiz would have "without a doubt" accepted the offer of 15 years to life.  Transcript II at 11.

21  Failure by Mr. Cook to accurate and properly advise Mr. Ruiz was a "gross mischaracterization of

22  the likely outcome" of the offered plea, *Iaea*, 800 F.2d at 865, and "undermined [Mr. Ruiz's]

23  ability to make an intelligent decision about whether to accept the plea offer," *Turner*, 281 F.3d at

24  880.  There is thus clear and convincing evidence that the state court's implicit finding to the

25  contrary, not based on an evidentiary hearing, was unreasonable and wrong.

26       b.   Mr. Cook's Advice on Accessory-After-The-Fact Instruction at Trial

27       Mr. Cook further provided erroneous advice on the possible effects of going to trial by

28  failing to inform Mr. Ruiz that it was highly unlikely that the jury would be given an instruction

United States District Court
Northern District of California

15

on an accessory-after-the-fact charge—a lesser offense alternative between murder and acquittal. Mr. Ruiz asserted: "Had I been advised that it was highly unlikely that the jury would be instructed on my theory of defense because the prosecution had to consent, that information would also have affected my decision to go to trial."  Ruiz Decl. ¶ 5.

Like his understanding (or misunderstanding) on the likelihood of parole, Mr. Ruiz's understanding of the consequences of going to trial was first shaped by Mr. Cooper.  Mr. Cooper led Mr. Ruiz to believe that he was likely guilty only of being an accessory after the fact: "I did not talk with Mr. Ruiz about what instructions I would ask for at trial.  I did not talk to Mr. Ruiz about requesting an instruction on a lesser related offense of accessory after the fact.  But I did talk to him about my opinion that, if anything, he was only guilty of being an accessory after the fact." Cooper Decl. ¶ 17.

Mr. Ruiz was led to believe the jury would be given the option of convicting him on the lesser offense of accessory after-the-fact, and a chance to avoid conviction of murder.  *See* Transcript II at 4 ("Q. And was – did Mr. Cook ever talk to you about anything relating to accessory after the fact, not the instruction but the crime?  A. Well, yes, that's – that was something that was mentioned, yes. . . . it was something that was, I guess from what I remember, part of our defense strategy or whatnot."); *id.* at 5–6 (Mr. Ruiz stating: "Well, just that, that everything I did was – was after – after the actual murder, everything . . . Just that everything that I did called for that, for being an accessory. So I believed that, like you said, there was a slim chance that, you know, getting just one juror to believe – believe that would, I guess is still keep me above water, you know, so to speak.").

The availability of a lesser conviction is something that may be valuable to a defendant where the jury is reluctant to render a total acquittal; the middle option may provide a less risky strategy to an "all-or-nothing" choice.  *See, e.g.*, *Brady v. United States*, 397 U.S. 742, 750–51 (1970) (describing pleading to the lesser-included offense for a lesser penalty as a less risky option than facing the range of trial options, from acquittal to conviction).  *Cf. Beck v. Alabama*, 447 U.S. 625, 625 (1980) (holding that the death penalty may not be constitutionally imposed following a jury verdict of a capital offense if the jury was not provided with a third option of a lesser included

offense). In his representation of Mr. Ruiz before and at trial, Mr. Cook failed to explain to Mr. Ruiz that an accessory-after-the-fact instruction was entirely contingent on the prosecutor who could unilaterally block the requested instruction. Instead, Mr. Cook leveraged the accessory-after-the-fact approach as a defense strategy at trial. To support the proposition that Mr. Ruiz had no knowledge that the murders would happen until after the fact, Mr. Cook encouraged Mr. Ruiz to testify to support that defense and recommended that they "should go to trial because [Mr. Cook] believed [Mr. Ruiz] had a 50/50 chance if [Mr. Ruiz] went up and testified." Ruiz Decl. ¶ 4; Transcript I at 111 ("Q. Did Cook tell you that you would need to testify to provide that necessary evidence in support of your defense? A. He did mention something to the effect to where I would – I was the one that could only tell my story. I was the one that could be able to explain everything so I guess yes."). Mr. Ruiz's denial of prior knowledge of the planned shooting and admission of knowledge after-the-fact could have led the jury, even if it had some doubt about Ruiz's prior knowledge, to convict on an accessory charge to prevent a total acquittal. But this strategy was flawed because the accessory instruction was *not* available absent the prosecutor's consent, which was refused. *See People v. Birks*, 19 Cal.4th 108, 112–13 (1998) (requiring the prosecutor's acquiescence to a defendant's lesser-related offense request). Yet Mr. Ruiz credibly testified Mr. Cook never told him about this problem in advance of trial.

That Mr. Ruiz was not told of the obvious impediment of the prosecutor's required consent is supported by the fact that it appears that Mr. Cook was not aware of the law at the time. The trial record suggests that Mr. Cook was not strategizing to, *e.g.*, preserve an issue for appeal as the government speculates but had simply misinterpreted the relevant case law. *See* Docket No. 30-30 Exh. 20 at 3992:9–3996:22 (opining, by Mr. Cook, that the relevant case law was the pre-1998 case of *People v. Geiger*, 35 Cal.3d 510 (1984), where a defendant could unilaterally request an instruction on a lesser-related offense); *id.* at 3996:9–20 (opining, by the court, that "what also changed in the law is that it is not—it is no longer an automatic reversal if the court does not relay—instruct on the lesser related, but the law changed so that the Court does not have any discretion, that the state of the law is a lesser-related offense can be given if, in fact, the prosecution agrees to it. And as we discussed in chambers, Mr. Cook, I don't see any discretion

1    whatsoever since it is an opinion and a theory and a doctrine which has been subsequently

2    followed by the California Supreme Court in more recent cases.").  Mr. Cook's explanation that he

3    knew a request for the accessory instruction was not likely to succeed was not credible.  *See*

4    Transcript I at 58 ("Q. Yeah, at the time had you read *Geiger* and *Burkes*?  A. I'm sure that I did

5    because I had to try to stitch something together in support of my request, and I knew it wasn't a

6    very strong argument. I didn't expect to win it, and it didn't – it didn't really – wasn't that

7    important anyway really.").

8        "An attorney's ignorance of a point of law that is fundamental to his case combined with

9    his failure to perform basic research on that point is a quintessential example of unreasonable

10   performance under *Strickland*."  *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).  Defense counsel

11   provides ineffective assistance where his advice is "not a strategic decision to forego one defense

12   in favor of another" but instead "the result of a misunderstanding of the law."  *United States v.*

13   *Span*, 75 F.3d 1383, 1390 (9th Cir. 1996); *see also, e.g.*, *White v. Ryan*, 895 F.3d 641, 666 (9th

14   Cir. 2018) ("A decision based on a misunderstanding of the law is not sound trial strategy.").

15       Regardless, even if he was aware of the case law which made the instruction unavailable

16   absent the prosecutor's consent, the Court finds that Mr. Cook discussed none of this with Mr.

17   Ruiz, and Mr. Ruiz proceeded under the misimpression that the accessory-after-the-fact approach

18   was a viable defense at trial and that the jury would have the option of conviction on this charge

19   rather than murder.  Transcript I at 110 (Mr. Ruiz stating: "[O]ur defense was going to be an

20   accessory after because I pretty much let it be known from the start that, you know, I was willing

21   to take responsibility and plead, you know, to what I did and as far as me helping out and – or

22   taking the guys there or helping out . . .."); Transcript II at 4 (Mr. Ruiz stating: "[Accessory after

23   the fact] was something that was, I guess from what I remember, part of our defense strategy.").

24   Mr. Ruiz had no knowledge that the accessory-after-the-fact jury instruction could be blocked by

25   the prosecutor.  Transcript II at 30 ("THE COURT: Did you have any knowledge that the DA

26   could block that possibility by saying no to such an instruction?  THE WITNESS: No, I did not

27   have knowledge of that. . . . THE COURT: Do you remember having any discussions about the

28   power of the DA in that regard with Mr. Cook?  THE WITNESS: No, no."); Transcript I at 26

United States District Court
Northern District of California

18

1    (Mr. Cook describing Mr. Ruiz as "not highly sophisticated the way that some of my clients in the

2    past have been regarding criminal justice system and how it operates.").

3         Defense counsel is "required to give the defendant the tools he needs to make an intelligent

4    decision." *Turner*, 281 F.3d at 881.  Mr. Ruiz was not given these tools.  He acted under the

5    misimpression that the lesser offense was an option, an option that could have increased his

6    chances of averting a murder conviction.  He was deprived of the tools necessary to make an

7    informed decision to go to trial.  Transcript II at 5–6 ("Q. So you thought that the jury could

8    theoretically say hey, we know he is guilty of this – of this accessory after the fact, but we don't

9    have enough evidence to say whether he was guilty of murder. Did you think that was a possible

10   result?  A. Yes. . . . Q. And did you – did that play a part in your decision to reject the plea offer?

11   A. It definitely did.").  His testimony in this regard was credible.

12        The Court finds that Mr. Ruiz was deprived of an opportunity to make an intelligent

13   decision in rejecting the plea offer and going to trial, as he was given inaccurate advice on both (1)

14   the likelihood of parole and (2) the availability of the lesser accessory-after-the-fact charge at trial.

15   The state court's implicit finding to the contrary was unreasonable.  There is clear and convincing

16   evidence that the state court's implied determination was in error.

17        3.    Prejudice

18        The Court concludes that Mr. Ruiz was prejudiced by Mr. Cook's two-prong erroneous

19   advice.  To establish prejudice, a defendant must demonstrate "a reasonable probability that, but

20   for counsel's unprofessional errors, the result of the proceeding would have been different.  A

21   reasonable probability is a probability sufficient to undermine confidence in the outcome."

22   *Strickland*, 466 U.S. at 694.  In the specific context of advice relating to a plea offer, the petitioner

23   "must show that but for the ineffective advice of counsel there is a reasonable probability that the

24   plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the

25   plea and the prosecution would not have withdrawn it in light of intervening circumstances), that

26   the court would have accepted its terms, and that the conviction or sentence, or both, under the

27   offer's terms would have been less severe than under the judgment and sentence that in fact were

28   imposed." *Lafler v. Cooper*, 566 U.S. 156, 163–64 (2012).  The petitioner must also show that

United States District Court
Northern District of California

19

there is a reasonable probability that, but for defense counsel's deficient performance, he would have accepted the proffered plea. *Id.* at 164; *In re Alvernaz*, 2 Cal. 4th 924, 937 (1992).

The Court finds that there is a reasonable probability that, but for the ineffective advice of Mr. Cook, Mr. Ruiz would have accepted the plea offer. Mr. Ruiz consistently and credibly testified that he would have taken the plea of a sentence of 15 years to life if there was a possibility of parole. *See* Transcript II at 3; Transcript II at 30. He asserted that he had originally "wanted to take [the plea of second degree murder with a sentence of 15-Life]." Ruiz Decl. ¶ 4. In the evidentiary hearing, he testified that he "ma[d]e it clear to Mr. Cook that [his] preference was to get a plea offer that ensured [he] would get out of prison as opposed to going to trial." Transcript I at 119; *see also* Transcript II at 34 ("Q. So when you rejected that plea offer initially, you weren't telling him essentially 'I don't want any plea offer.' You just said: 'Let's keep pushing for something better'? A. Yes, keep trying to work with him and maybe we can, you know, avoid going to trial."). He clarified that although he would have preferred a plea offer with a determinate sentence, he also would have taken the plea of 15 years to life if he had known that it was not "effectively a life sentence" with a possibility of parole over the "slim chance" of acquittal he had at trial, a chance that was slimmer than he thought in view of the unavailability of the accessory after-the-fact instruction. *See* Transcript II at 38; *see, e.g.*, Transcript I at 108 ("Q. [A]n offer for 25 years determinate, would you have taken it? A. Twenty-five years with no life? Q. With no life. A. Yes, I would have."). Mr. Ruiz considered a plea to a guaranteed life sentence with *no* possibility of parole to be an outcome he wanted to avoid. *See* Transcript I at 114 ("Q. So again, did this – knowing all these aspects, knowing how much importance was – just knowing how crucial your testimony was and then knowing that there were all these aspects that could be a– that it could be attacked for, did that make you scared to go to trial? A. It did but at the same time, I mean, it's – what plea to another life? You know, it was that or actually plead to a life sentence as well myself."). Mr. Ruiz convincingly explained that "all [he] wanted was to find a way to get out of prison at some point . . . to give [his] family a date." Transcript II at 3 (Mr. Ruiz explaining that he wanted to choose an option that conveyed to his family that "like look it's going to be okay but, you know, eventually, yes, just any kind of date, any number that would get me,

20

you know, to them at one point.").  Having considered all the evidence to Mr. Ruiz's testimony, the Court finds Mr. Ruiz is credible and fully credits his testimony.

Indeed, others, like Mr. Cooper, also concluded Mr. Ruiz was interested in a plea offer: "He was very interested in pursuing a plea bargain for multiple reasons. He was being charged in Contra Costa County, which is very difficult. Also, the prosecution was accusing him of being not only a gang member but the leader of the gang. For those reasons, he was interested in securing a plea bargain and said he would definitely consider a plea to a determinate term."  Cooper Decl. ¶ 6.  Further, Mr. Ruiz knew he faced substantial evidence against him in trial: his central role in the cover-up, the visibility of the shotgun in his car when the co-defendant entered prior to the shooting, and the video evidence that he may have cased the scene prior to the shooting.  *Cf. Jones v. Wood*, 114 F.3d 1002, 1012 (9th Cir. 1997) (finding no reasonable probability when the defendant was told that the government's case against him was weak and without convincing evidence).  What he did not know was that the jury would be presented with an all-or-nothing question, making outright acquittal all the more unlikely.

Mr. Cook's incorrect advice drastically affected two critical variables in Mr. Ruiz's calculation in regard to the plea offer.  The erroneous advice simultaneously decreased the benefit of the plea offer and increased the favorability of going to trial.  Having conserved all the evidence, including Mr. Ruiz's testimony which the Court credits, the Court finds there is a reasonable probability that Mr. Ruiz would have accepted to plea in the absence of the erroneous advice he received from counsel.

There is no evidence that the government would have withdrawn the plea offer, *Lafler*, 566 U.S. at 164, given that the prosecutor left the offer open until the start of trial.  And there is little doubt that the court would have accepted Mr. Ruiz's plea, *id.*, given that the court accepted similar pleas of his co-defendants.  Further, there is no question that Mr. Ruiz's sentence under the plea offer's terms were less severe than under the sentence imposed after trial.  *Id.*

In light of all the evidence presented, a "reasonable probability" existed at the time of the offer that had Mr. Cook met professional standards, Mr. Ruiz would have agreed to plead to second-degree murder rather than go to trial.  The witness testimony at the evidentiary hearing

United States District Court
Northern District of California

confirms the Court's previous determination that "[g]iven the record evidence and the magnitude of the error, the state court could not reasonably have found that Mr. Ruiz was not so prejudiced" by Mr. Cook's two-prong error.  Order at 26.  Again, the record before this Court establishes by clear and convincing evidence that any implied finding by the state court to the contrary was erroneous.

IV.      <u>CONCLUSION</u>

For the foregoing reasons, the Court **DENIES** the government's Motion to Alter or Amend the Judgment and **GRANTS** the petition under 28 U.S.C. § 2254.  The Court orders the government to provide forthwith Mr. Ruiz with the original plea agreement offered.

This order disposes of Docket No. 15.

**IT IS SO ORDERED**.

Dated: April 10, 2023

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California